UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ROBERT OLSON,

                Plaintiff,                <u>DECISION and ORDER</u>

          - against -                 2:04-cv-00419-ENV-MLO

STATE OF NEW YORK, NEW YORK STATE
POLICE-DIVISION OF STATE POLICE,
STEPHEN OATES, PRESTON L. FELTON, and
JAMES W. MCMAHON,

                Defendants.
----------------------------------------------------------------X

VITALIANO, D.J.

      Plaintiff Robert Olson ("Olson"), a former New York State Trooper, brings this action alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 <u>et</u> <u>seq</u>., and of his civil rights, pursuant to 42 U.S.C. § 1983, against the State of New York, the Division of State Police, and State Police employees Stephen Oates, Preston L. Felton, and James W. McMahon (collectively "defendants").

      Specifically, plaintiff has pled a cause of action against the state and the State Police for violation of the ADA and, pursuant to 42 U.S.C. § 1983, against the state, the State Police, and the individual defendants, in both their official and individual capacities, for violating his First Amendment rights. For relief, plaintiff demanded damages against all defendants on each claim, and injunctive relief in the form of immediate reinstatement and removal from his personnel file of any wrongful disciplinary actions, plus attorney's fees and costs.

      On August 20, 2004, defendants moved against the complaint pursuant to Federal Rule of

Civil Procedure 12(b)(1) and 12(b)(6), which resulted in an Order of District Judge Denis R. Hurley dismissing plaintiff's § 1983 claims against the individual defendants in their official capacities and plaintiff's § 1983 claims against the individual defendants in their individual capacities, except as relating to Olson's contention of wrongful termination from employment. See Olson v. State of New York et al., No. 04-cv-0419, 1, 5-6 (E.D.N.Y. March 9, 2005) (Hurley, U.S.D.J.) [hereinafter "Olson, at __."] Judge Hurley also denied defendants' motion to dismiss with respect to plaintiff's ADA claims. See Olson, at 7-9. Discovery is now certified as complete, and defendants have moved for summary judgment on plaintiff's remaining claims, charging that he was wrongfully terminated in violation of § 1983 on account of his union activities and that his suspension, reassignment to another barracks, and ultimate termination were based on disability discrimination in violation of the ADA.

## FACTS [1]

Olson, now 57 years old, became a New York State Trooper in 1981 and was promoted to Investigator in the Bureau of Criminal Investigation ("BCI") in September 1989. From 1989 to his suspension on January 18, 2002, plaintiff was assigned to the Riverhead Barracks under the direct supervision of defendant Senior Investigator Stephen Oates ("Oates"). During this period, in April 2000, Olson was elected the Long Island delegate of his union, the New York State Police Investigators Association.

---

[1] Familiarity with Olson is presumed. Unless otherwise noted, the facts presented in this Decision and Order are undisputed.

In March of 2001, plaintiff was hospitalized for acute depression and took voluntary sick leave until January 2002. The parties agree that Olson's job performance declined prior to his hospitalization, including difficulty in concentrating and paying attention to detail, and that Olson told Oates he "was having a tough time, you know, basically coping." Oates responded to plaintiff's diminished job performance by saying that plaintiff should take time to do whatever he needed to get better. Although they disagree as to when and how Oates learned Olson was being treated for depression, they agree that, as of the date Olson claims be began to experience discrimination, Oates perceived plaintiff as having an impairment.

As to the unfolding of plaintiff's illness and treatment, the parties further agree that Oates expressed concern and support for Olson, though, plaintiff claims, that such expressions were in the hopes that Olson would not have to be hospitalized and take sick leave. Plaintiff also offers a conversation that Oates allegedly had with plaintiff's wife after learning of plaintiff's condition, in which Oates told her that Olson would not be able to return to work if he took medical leave to treat his depression. To the same effect, plaintiff offers the deposition testimony of Trooper Michael F. Kelley that Oates stated plaintiff would not be returning after his medical leave. Defendants counter with the testimony of Captain William Carey that there was general talk among members of plaintiff's troop, including Oates, that Olson would choose to retire rather than return to duty. Oates testified at his deposition that, in the same time period, he did contact then First Deputy Superintendent William Bennett regarding the possibility of plaintiff's retirement, but stated that he did so solely to ensure that plaintiff would receive his benefits.

On a different plane, plaintiff alleges that, while he was out on sick leave, he requested

3

temporary light duty upon his return, but was told by Patrick Hawkins of the State Police Employee Assistance Program in response to his request that there was no such thing as light duty within the Division of State Police. This was confirmed back-handedly by defendant Preston L. Felton ("Felton"), an assistant deputy superintendent of the State Police, who testified in accord with the New York State Police Administrative Manual that modified duty was available, but only for troopers, who, at minimum, were less than 50% disabled and had made their request for such duty in writing. Plaintiff testified that he never submitted a written request for modified duty because he was told light duty did not exist; there is agreement that no written request for modified duty was ever made by Olson or ever denied. Plaintiff, it is not disputed, returned to full duty on January 3, 2002.

On January 18, 2002, plaintiff entered Oates's office upon arriving at work in the morning to tell him that he wished to go to Commack to meet with the president of CSEA, the union representing most state workers, at the request of other union representatives. An inspection by superior officers was scheduled for the barracks that day. Oates denied plaintiff's request. Oates then instructed plaintiff to update a warrant, and Olson hoped, if he did so, he would be allowed to go to Commack. Despite Oates's direction to plaintiff to go to Southampton to deal with the warrant, plaintiff asked Investigator William Rivera to make a telephone call regarding the warrant because, according to Olson, he believed Rivera's fluency in Spanish better equipped him to complete the assignment. Olson then represented that the work was done and renewed his request to go to Commack. Oates again declined permission, telling plaintiff to return to his office. According to Oates, Rivera, and another trooper, Tammy

4

Mickoliger, plaintiff remarked in reply that there would be some bloodshed.

Olson denies making any such statement. Trooper Patrick Liberti and Sergeant Paul Slevinski also deny hearing plaintiff make it. Notwithstanding, according to defendants, Mickoliger, and not Oates, reported Olson's alleged comment to Captain Carey. Defendants do not deny, however, that upon being questioned by Carey, Oates confirmed the alleged threat. Carey then interviewed Mickoliger and directed Rivera to prepare a written memorandum of the events. Carey did not interview plaintiff, Slevinski, or Liberti. After reviewing the information gathered from Oates, Mikoliger, and Rivera and with knowledge of plaintiff's voluntary leave for depression, Felton signed a suspension order, pursuant to Rule 13.1(b) of the New York State Police Code, which allows an employee to be placed on involuntary leave of absence when the employee is determined to be a potential danger to himself or others. The suspension was predicated on the alleged verbal altercation between plaintiff and Oates and the alleged bloodshed remark. At approximately 7:00 p.m. on January 22, 2002, Carey and a senior investigator arrived at the barracks, demanded plaintiff's badge and gun, and informed him of the suspension. In the ensuing conversation, plaintiff admitted that he may have been aggressive in the way he spoke to Oates, that he may have been posturing when speaking to him, and that he did make a remark to the effect that he was not going to be pushed around anymore.

Plaintiff was examined by a psychiatrist, Dr. Patrick Corone, appointed by the State Police; Dr. Corone deemed Olson fit to return to duty. Dr. Corone issued a report to that effect, which was sent to a State Police physician, Dr. William F. Conway. Conway and the personnel director then jointly recommended that plaintiff be restored to duty, which was adopted by

Felton. Olson returned to duty on February 13, 2002. Upon his return, plaintiff was reassigned from Riverhead to the Brentwood barracks. The transfer was involuntary, but, as a result, Oates ceased to be plaintiff's supervisor.

After his return to work, Olson sent out a statewide email regarding a fund raiser for a fellow trooper's father. In response, plaintiff received an email from Carey warning him that if he sent out another statewide email without the permission of the troop commander, he would be subject to disciplinary action. Plaintiff subsequently sent out emails anyway in support of a political candidate and was called in to speak to a senior investigator about them. After advising the senior investigator of a family emergency via telephone, plaintiff arrived late to the meeting on August 9, 2002 and, it is uncontested, directed obscenities at the senior investigator. Based on sending the emails statewide and the incident with the senior investigator, plaintiff received a memorandum from the First Deputy Superintendent dated November 6, 2002 with the recommendation that plaintiff be suspended for three days, placed on probation for six months, and formally censured for violating State Police regulations. Plaintiff chose to accept the recommended penalty rather than demand that formal charges be brought.

On January 15, 2003, plaintiff, while on probation, drafted a memorandum in the name of another investigator in reference to overtime pay disputes, suggesting that "back room" investigators trade places with "front room" investigators. Plaintiff alleges that the memorandum was facetious in nature and that, when he showed it to others in the squad room, they laughed and recognized it as a joke. Plaintiff also used the State Police facsimile machine to fax the memo to the White Plains station. (Plaintiff was no longer the union delegate when he

drafted and sent this memo.) Plaintiff admits that he knew the facsimile machine was to be used only for official business. Subsequently, Olson was ordered to provide a statement about the memo, which he refused to do without the advice of counsel. Plaintiff, however, offers no proof that he ever sought the advice of counsel or requested a delay in disciplinary procedures to allow him to seek counsel. By letter dated March 27, 2003, plaintiff was given formal notice of his termination for engaging in misconduct during his probationary period and for refusing to provide a statement regarding that misconduct.

## DISCUSSION

### A.     The Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides for the grant of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A fact is "material" for these purposes when it "might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2551, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the burden of demonstrating that no issue as to any material fact exists. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). A motion for summary judgment, on the other hand, cannot be defeated by "[t]he mere existence of a scintilla of evidence in support of the

[nonmoving party's] position . . . there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512, 91 L.Ed.2d 202. Accordingly, the nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). Put another way, nonmoving parties "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

Nevertheless, because direct evidence of discriminatory intent is rare, a trial court must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997). See also Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). "[A]ffidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Gallo, 22 F.3d at 1224-25 (allowing plaintiff to use "direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false"). See also Byrnie v. Town of Cromwell, Board of Education, 243 F.3d 93, 102 (2d Cir. 2001) ("At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer."). That said, a plaintiff may not defeat an otherwise valid motion for summary judgment by merely invoking intent or "by offering purely

8

conclusory allegations of discrimination, absent any concrete particulars." Meiri, 759 F.2d at 998.

B.     **The ADA Claims**

The ADA "forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." Tennessee v. Lane, 541 U.S. 509, 516-17, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004). Title I of the ADA prohibits covered entities from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Where, as here, a plaintiff alleges intentional discrimination under the ADA, the three-step burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies. See Heyman v. Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999). Although a plaintiff's burden is de minimis, Cronin v. Aetna Life Insurance Co., 46 F.3d 196,

9

204 (2d Cir.1995), he or she must establish a prima facie case of discrimination by a preponderance of the evidence, Heyman, 198 F.3d at 72. The burden then shifts to defendants "to articulate some legitimate, nondiscriminatory reason" for the disputed employment action. McDonnell Douglas, Corp., 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d 668. At this stage, defendants' burden is one of production and not persuasion. See Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998). "The employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." Greenway, 143 F.3d at 52. If defendants are able to articulate such a reason, the presumption of discrimination created by plaintiff's prima facie showing is rebutted, and plaintiff must make a showing that the reason proffered by defendants is really a pretext for intentional discrimination to survive summary judgment. At this juncture, a plaintiff's burden is heightened: he or she must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge.' " Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (quoting Woroski v. Nashua Corp., 31 F.3d 105, 110 (2d Cir.1994)).

To make out a prima facie case under the ADA, and thus satisfy the first step of McDonnell Douglas, plaintiff must show "that (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." Heyman, 198 F.3d at 72. See also Ryan

v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d Cir. 1998).

The parties do not dispute that Olson was either disabled or perceived to be disabled within the meaning of the ADA, 42 U.S.C. § 12102(2)(A)-(C), that he was otherwise qualified to perform his job, with or without a reasonable accommodation, and that he suffered an adverse employment action. Defendants do dispute, however, that, as a sovereign, the State of New York and its agency, the New York State Police, can be liable for money damages under Title II of the ADA.[2] Further, defendants argue, Title II of the ADA does not authorize suits against state officials in their individual capacities. See Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001). With regard to plaintiff's claim for injunctive relief, that is reinstatement and expungement of his personnel file, under Title I of the ADA, defendants' argue that Olson has not shown the requisite discriminatory intent.

1. Sovereign Immunity

The Eleventh Amendment grants states immunity against suit. See Kimel v. Florida Bd. of Regents, 528 U.S. 62, 72-73, 120 S.Ct. 631, 640, 145 L.Ed.2d 522 (2000). The immunity is not absolute in that states may waive it or Congress may abrogate it through legislation to enforce the substantive rights guarantee of the Fourteenth Amendment. See U.S. CONST. amend. XIV, § 5; Tennessee v. Lane, 541 U.S. 509, 518, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004); Fitzpatrick v. Bitzer, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

---

[2] In Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 374, 121 S.Ct. 955, 967-68, 148 L.Ed.2d 866 (2001), the Supreme Court held that Title I of the ADA did not effectively abrogate state sovereign immunity under the Eleventh Amendment and that states were thus immune from suits by private individuals seeking money damages, but left the question of money damages under Title II open.

11

In Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 110-12 (2d Cir. 2001), the Second Circuit held that, in enacting Title II of the ADA, Congress had exceeded its authority under § 5 of the Fourteenth Amendment, but that Title II could be rehabilitated by requiring "plaintiffs bringing such suits to establish that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability." Judge Hurley, in fact, held that Olson could pursue a private suit for money damages against the state under Title II of the ADA on that very basis. See Olson, at 7 (quoting Garcia, 280 F.3d at 112). Defendants argue, however, that the law has changed since Judge Hurley's decision and that Olson can no longer maintain suit. Defendants rely on the Supreme Court decision of United States v. Georgia, 546 U.S. 151, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006) coupled with Tennessee v. Lane, 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004), for the proposition that Garcia has been overruled and that an individual has a private right of action for money damages against the state only if he can show the violation of a fundamental right guaranteed by the Fourteenth Amendment.

Although defendants are correct that the law has not remained stagnant in this area, they have failed to show a change in the *controlling* law. In Lane, the Supreme Court held "that Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." 541 U.S. at 533-34, 124 S.Ct. at 1994, 158 L.Ed.2d 820. In Georgia, the Supreme Court noted the disagreement among members of the Court "regarding the scope of Congress's 'prophylactic' enforcement powers under § 5 of the Fourteenth Amendment" and held that "insofar as Title II creates a private cause of action for damages against the States for conduct

12

that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." 546 U.S. at __, 126 S.Ct. at 881-82, 163 L.Ed.2d 650. Contrary to defendants' contentions, the Supreme Court did not reach in either case the issue of whether Title II validly abrogates state sovereign immunity for conduct that violates Title II but does not violate the Fourteenth Amendment. In fact, in <u>Georgia</u> the Supreme Court expressly held that, on remand, the lower courts should

> determine in the first instance, on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) *insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid*.

<u>Id</u>. (emphasis added).

Put another way, the Court expressly left open the possibility that misconduct that does not violate a fundamental right protected by the Fourteenth Amendment could nevertheless violate Title II and lead to a valid private cause of action for money damages against a state. The Second Circuit, moreover, has yet to address the fate of <u>Garcia</u> in the wake of <u>Lane</u> and <u>Georgia</u>, even though district courts in this Circuit have adopted divergent positions as to whether <u>Garcia</u> has been abrogated. Compare <u>Degrafinreid v. Ricks</u>, 417 F.Supp.2d 403, 409-10 (S.D.N.Y. 2006) (holding that <u>Lane</u> superseded <u>Garcia</u> and that <u>Georgia</u> "refined" the <u>Lane</u> test); <u>Press v. State University of New York at Stony Brook</u>, 388 F.Supp.2d 127, 133 (E.D.N.Y. 2005) (noting division among district courts in Second Circuit on whether <u>Lane</u> addressed only cases implicating fundamental rights and <u>Garcia</u> applies to all others or whether <u>Lane</u> superseded

13

Garcia) with Goonewardena v. New York, __ F.Supp.2d __, 2007 WL 510097 (S.D.N.Y. 2007) (applying test established in Georgia and holding where plaintiff stated a claim under Title II of the ADA but not a violation of the Fourteenth Amendment, court would determine whether abrogation of sovereign immunity valid exercise of Congressional power); Brown v. DeFrank, 2006 WL 3313821 (S.D.N.Y. 2006) (applying Garcia standard of motivation by either discriminatory animus or ill will due to disability under Georgia); Harris v. New York State Education Department, 419 F.Supp.2d 530, 533-34 (S.D.N.Y. 2006) (same); Toney v. Goord, 2006 WL 2496859, *5 n.1 (N.D.N.Y. 2006) ("In Georgia, the Supreme Court declined to address the question of whether Title II validly abrogates sovereign immunity for conduct that does not violate the Constitution."); Antkies v. New York State Dept. of Motor Vehicles, 2006 WL 721364, *3 (E.D.N.Y. 2006) (same); Hallett v. New York State Department of Correctional Services, 2006 WL 903200, *4 (S.D.N.Y. 2006) (applying Garcia test after finding Supreme Court did not speak "to the validity of Title II's purported abrogation of sovereign immunity as to conduct that does not also violate the Constitution" in Georgia); Lighthall v. Vadlamudi, 2006 WL 721568, *18 (N.D.N.Y. 2006) (same).

The decisional law reduced to the essentials points to the conclusion that Garcia remains good law. As such, this Court finds that the controlling law on this issue has not changed and declines to disturb Judge Hurley's ruling. Should the Second Circuit or the Supreme Court hold to the contrary before final judgment in this matter has been rendered, this Court will, of course, revisit the issue. See Virgin Atlantic Airways, Ltd. v. National Mediation Board, 956 F.2d 1245, 1255 (2d Cir. 1992).

14

2. <u>Discriminatory Intent</u>

The Court need not delve deeply into the record to find genuine issues of material fact with regard to discriminatory intent. The undisputed facts show that at least one of plaintiff's immediate supervisors, Oates, perceived him to have an impairment, that several of Olson's supervisors and colleagues discussed whether he would retire or return to duty after voluntary medical leave, that Olson was suspended from duty and reinstated after being found fit for duty by State Police doctors, that Olson was involuntarily transferred, that Olson was disciplined and placed on probation, and that he was terminated. The crux of the matter is why. Defendants allege that Oates merely sought to ensure Olson would receive all of his retirement benefits, that Olson was suspended after making a violent comment because he was a danger to himself and others, that he was transferred to defuse the personality conflict between himself and Oates, that Olson agreed to be disciplined and placed on probation after a prior warning and for directing obscenities at a supervising investigator, and that plaintiff was terminated for violating the terms of his probation by writing a memorandum in the name of another investigator and using the office facsimile machine to disseminate the memorandum.

Plaintiff argues that the proffered reasons are pretextual. Prior to his voluntary medical leave, plaintiff had received positive job evaluations. There is also no question that all of the alleged adverse employment actions occurred after supervisors perceived Olson as being impaired. Plaintiff argues that Oates's comments to his wife and to Trooper Kelly that plaintiff would not be returning to duty lead to an inference of discriminatory intent. Further, plaintiff contends, that use of the statewide email system and office facsimile machine was commonplace

and that other troopers committed much more serious infractions than he and were not disciplined. Plaintiff cites to the example of an investigator, who was arrested on domestic violence charges and was the subject of an order of protection. Rather than suspend that trooper, the State Police accommodated him by making arrangements so that he only carried his weapon while on duty. Plaintiff, on the other hand, was suspended and had his gun and badge seized for allegedly making a violent statement. Finally, plaintiff contends that the State Police did not follow their own procedure in investigating whether Olson made the alleged threatening statement in that they did not interview all available witnesses.

The bottom line is this: at this stage of the litigation, the Court is still not in the position of resolving issues, but of identifying them. Plaintiff has presented sufficient evidence of circumstances from which the finder of fact could draw an inference that the adverse consequences he suffered were motivated by either discriminatory animus or ill will due to his actual or perceived disability and that the reasons ascribed by the state for the adverse actions experienced by Olson were pretextual. As a result, Olson's claim under Title II of the ADA survives the motion for summary judgment. Likewise, the sufficient demonstration of discriminatory intent made by plaintiff on the Title II claims also satisfies his burden under Title I.[3]

---

[3] The record establishes that Olson reached the age of 57 on October 4, 2006. The Court takes notice of § 381-b(e) of the New York State Retirement and Social Security Law (McKinney 2007), which mandates the retirement of New York State Police investigators as of December 31st of the year in which the investigator attains the age of 57. Under this section of law, Olson would have been retired from State Police service mandatorily on December 31, 2006. Effectively, reinstatement is no longer available relief in his Title I cause of action.

## C.     The § 1983 Claim

What remains of plaintiff's original § 1983 claims are claims against the individual defendants in their individual capacities based on Olson's termination.[4]  A state official is subject to suit under § 1983 for conduct engaged in while carrying out official responsibilities.  See Hafer v. Melo, 502 U.S. 21, 31, 112 S.Ct. 358, 365, 116 L.Ed.2d 301 (1991).  Plaintiff asserts–and defendants do not dispute–that, in terminating his employment from a state agency, any of the individual state employee defendants were acting under color of state law.

Olson alleges that his termination was in retaliation for his union membership and activities and, thus, in violation of his First Amendment rights to freedom of speech and/or association.  Defendants do not contest that public employees retain their First Amendment rights,[5] but argue that Olson has presented no evidence to link his termination with an anti-union bias.  The Court agrees.

First, Oates was no longer Olson's supervisor when Olson was terminated, and Olson, despite extensive discovery, has made no showing that Oates was in any way involved in the

---

[4] See Olson, at 6, 10.  Obviously, the State of New York and its Division of State Police are not persons subject to suit under § 1983.  See Will v. Michigan Department of State Police, 491 U.S. 58, 70-71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989).

[5] Public employees do not enjoy an unfettered right to free speech and/or association.  "Courts determine the extent to which the government may permissibly regulate the speech of its employees by balancing the interest of the employee, 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " Cobb v. Pozzi, 363 F.3d 89, 101-02 (2d Cir. 2004) (quoting Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).  See also Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).  Union membership and activities are matters of public concern.  See Scott v. Goodman, 961 F.Supp. 424, 434-35 (E.D.N.Y. 1997), aff'd Scott v. Meyers, 191 F.3d 82 (2d Cir. 1999).

decision to terminate him.  Second, all of Olson's allegations of anti-union bias are against Oates.  Even taking Olson's allegations at face value, they implicate only Oates and not Felton or defendant James W. McMahon ("McMahon"), the former Superintendent of the New York State Police.  Olson's allegation is that Oates, Felton, and McMahon fabricated the bloodshed remark as a pretext for suspending him because of his perceived disability, not for terminating him more than a year later for union activities.

In the absence of any allegations–much less proof–on the part of plaintiff that Oates had any involvement in his termination or that Felton and/or McMahon acted out of anti-union animus, the Court must grant defendants summary judgment on plaintiff's remaining § 1983 claims.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted to the extent that Olson's remaining § 1983 claims are dismissed as to all defendants.  The motion is denied as to Olson's claims under the Americans with Disabilities Act against the State of New York and its Division of State Police.

The parties are directed to file a Joint Pre-Trial Order in compliance with this Court's Individual Motion Practice and Rules on or before April 16, 2007.  A final pre-trial conference

will be held on April 27, 2007 at 3:30 p.m. in Courtroom 6.  Trial will commence on May 7, 2007 at 9:30 a.m. in Courtroom 6.

        SO ORDERED.

DATED:      Brooklyn, New York
                March 30, 2007

                                              ERIC N. VITALIANO
                                              U.S.D.J.